Cheryl **SANDERS**, Cecile White, Cheryl Ulrich, Martha Surratt, Sarah Williams, Kelly Vick, and Christians for a Better Community, Inc., on their own behalf and on behalf of all others similarly situated, Plaintiffs,

v.

The **UNITED STATES DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT,** its Secretary, the Allegheny County Housing Authority and its Executive Director, the Redevelopment Authority of Allegheny County and its Executive Director, and the County of Allegheny, Pennsylvania, Defendants.

Civ. A. No. 88–1261.

United States District Court, W.D. Pennsylvania.

Dec. 22, 1994.

Donald Driscoll, Neighborhood Legal Services Assn., Pittsburgh, PA, Thomas J. Henderson, Lawyers Committee for Civil Rights Under Law, Washington, DC, for plaintiffs.

Richard Lepley, Trial Atty., Civ. Div., U.S. Dept. of Justice, Washington, DC, for defendant Dept. of Housing & Urban Development.

John T. McVay, Jr., Sol., Allegheny County, Pittsburgh, PA, for defendant Allegheny County Housing Authority.

Robert N. Peirce, Sol., Allegheny County Redevelopment Authority, Pittsburgh, PA, for defendant Redevelopment Authority of Allegheny County.

Mark R. Hornak, Gregory A. Miller, Buchanan Ingersoll, Byron Xides, Asst. Sol., County of Allegheny, Pittsburgh, PA, for Allegheny County.

## OPINION

DIAMOND, District Judge.

On December 12, 1994, this court conducted a hearing to determine whether it should grant final approval of a consent decree offered as a resolution of this civil rights class action. At the conclusion of the hearing, the court (1) found that the consent decree was a fair, adequate and reasonable resolution of this litigation; (2) granted final approval of the consent decree pursuant to Fed.R.Civ.P. 23(e); and (3) entered the consent decree as an order of the court. This opinion will formalize and supplement the court's rulings made on the record in open court during the hearing.

### I. *Background*

Plaintiffs filed this lawsuit in 1988 against the Department of Housing and Urban Development ("HUD"), the County of Allegheny (the "County"), the Allegheny County Housing Authority ("ACHA"), and the Redevelopment Authority of Allegheny County ("RAAC"), to remedy the alleged establishment of *de jure* racial segregation in public and other federally assisted housing in Allegheny County, Pennsylvania, and the alleged perpetuation of and failure to disestablish that segregation.

On October 15, 1992, a plaintiff class was certified consisting of "all black current residents in, or applicants for, public housing assisted by the ACHA and/or HUD, who have been and continue to be denied decent, affordable, and racially integrated public housing opportunities." *See* Opinion and Order, October 15, 1992.

In 1993, HUD admitted liability for failing to affirmatively further fair housing in the ACHA public housing program; a violation of Title VIII of the Civil Rights Act of 1968,

42 U.S.C. § 3608(e)(5). In January of 1994, HUD assembled a task force with expertise in all of the various programs at HUD, to develop a desegregation plan for Allegheny County. That effort resulted in a plan which served as the basis for the consent decree offered as the settlement of this litigation.

The parties sought and obtained the court's preliminary approval of the consent decree on August 31, 1994. Notice of the consent decree, as approved by the court, was given to all class members, including those individuals with African American or bi-racial family members, by mailing notice by first-class mail to the last known available address of all current residents in ACHA public and Section 8 housing and all current applicants for ACHA public and Section 8 housing and by publishing such notice once each week for two weeks in the Pittsburgh Post Gazette and the New Pittsburgh Courier. Individual notice was mailed to 9,455 persons, approximately 5,000 of whom were members of the class.

The class notice was designed to acquaint class members with the scope and nature of the consent decree in a concise and easily understood format. Rather than risk confusion by describing in detail the complicated and lengthy provisions, the notice emphasized major provisions and explained the character of the consent decree and its intended purpose. This summary was complimented by italicized warnings informing the reader that the notice was only a summary and that review of the consent decree was necessary to learn all of its terms. The notice also explained succinctly how interested persons could comment or object to the proposed consent decree, in writing, and if desired, at a fairness hearing to be conducted by the court.

Written submissions in response to class notice of the consent decree were filed by five persons, three of whom were class members interested in the resolution of the litigation. Of a possible 5,000 class member re-

sponses, only one class member, Davida Brooks, stated that she had an objection to the consent decree.[1] The fairness hearing was held as provided for in the published notice on December 12, 1994. Counsel expressed their views in support of the consent decree.[2] All of those who wished to be heard were given the opportunity.

## II. *The Consent Decree*

The objectives of the decree are to decrease the level of racial spacial separation in federally assisted housing programs and the private housing market in Allegheny County, and to increase desegregative housing choices and opportunities for class members and other low income persons.

Section II of the decree, which defines significant terms within the decree, describes the creation of a "Task Force." The Task Force will consist of representatives or designees of the parties, a Fair Housing Services Center created under the terms of the decree, and community based organizations selected by the plaintiffs and HUD. The Task Force will be the entity to select sites for the development of new units and to implement certain critical community development provisions of the decree.

Section III of the decree governs the siting of all replacement units in Allegheny County. This section provides for the construction of 100 units of public housing to replace those units demolished at Talbot Towers. These units and all other units will be developed as scattered site units, in clusters of between one and twelve units, and will be developed in defined areas of the county to provide class members with housing opportunities outside of racially identifiable and low income impacted communities.

Section IV of the decree provides for physical improvements to public housing developments and the surrounding neighborhoods to reduce disparities and to facilitate desegregative housing choices. To determine what improvements should be made, HUD will prepare and administer a tenant survey, and

---

1. Four other persons filed letters with the court, Mary Sherman, Pauline Christian, Leah Evans, and Willa Mae Koon. None of these individuals raised objections to the specific terms of the decree in their letters.

2. The parties also submitted memoranda in support of the consent decree.

HUD will list those amenities enjoyed by tenants at identifiably white developments. The decree requires the ACHA to establish priorities and provide these amenities according to those priorities. In addition, the decree requires the ACHA to eliminate any deficiencies in the enforcement of HUD's housing quality standards, and eliminate any disparities found by HUD and maintenance services among its developments.

Section V of the decree requires the parties and the Task Force to use funds provided under the decree to leverage other federal, state, and private resources to eliminate vestiges of discrimination and segregation throughout the County. The decree is designed to redirect resources so that more home ownership assistance and development of affordable housing and employment opportunities can take place in impoverished African American communities, while traditional public housing assistance can be used in white communities of higher income populations that have barred the use of such assistance within their borders in the past.

This section of the decree also calls for the demolition and replacement of dilapidated or obsolete units as scattered site units outside of racially identifiable and low income impacted communities. In addition, adequate transportation and police protection are to be provided at all of the ACHA's public housing developments.

The decree provides that the Task Force will be the entity to implement the extensive community development provisions of the decree. The Task Force will identify mechanisms for the targeting of resources, including all federal, state, local, and private resources, identify and develop a plan of housing and community and economic development activities and opportunities provided for in the decree, and approve all projects and expenditures related to community and economic development in the decree.

Section VI of the decree calls for the eventual merger of the public housing and Section 8 waiting lists. Individuals on the two lists will first be cross-listed, so that individuals may be offered, but not penalized for rejecting, a unit for which they did not apply. After one year, the lists will be merged so

that an applicant will be offered a range of all available desegregative housing opportunities, which may include conventional public housing, Section 8 tenant based assistance, and other assisted housing units. Each applicant will receive counseling by a nonprofit Fair Housing Services Center ("FHSC"), created under section VII of the decree, at the time he or she is made an offer or offers.

This section provides that the ACHA jurisdiction initially will be divided into four regions so that, if an applicant is offered a desegregative opportunity outside his or her home region, he or she may reject the offer without penalty. If no desegregative opportunities are available, the applicant will be offered other available units, but may wait for a desegregative housing opportunity. If an applicant is offered, but rejects, a desegregative housing opportunity in his or her home region, except where good cause is shown, the applicant would move to the bottom of the waiting list.

Section VII of the decree creates the FHSC which will counsel each applicant at the time he or she is offered housing in the County and assist applicants in considering and making desegregative moves. The FHSC also will perform marketing and outreach services to help increase the number of landlords in identifiably white areas willing to accept Section 8 certificates. The decree also creates a mechanism for the offering of assisted housing units through the FHSC, which will further increase the desegregative housing opportunities available to class members.

This section also creates a Section 8 Mobility program that provides class members with 450 desegregative Section 8 certificates. To ensure that low income persons such as class members are able to use Section 8 assistance in units that are decent, safe, and sanitary, the ACHA will obligated to inspect a certain number of units to determine whether HUD's Housing Quality Standards are being met.

Section VIII of the decree requires that HUD conduct a study, or Housing Opportunities Analysis, to determine whether class members actually have housing opportunities

in areas previously closed to them, and whether additional assisted housing should be provided to enhance class members' desegregative housing opportunities.

Section IX of the decree provides for the commitment of extraordinary expenditures, or those expenditures over and above those resources that would be provided to the County and the ACHA in the normal course, for a period of seven years. This section also ensures the defendants' compliance with the terms of the decree. The defendants are enjoined to implement the decree and take all actions necessary to fulfill its obligations. In addition, the court will retain jurisdiction over the case for at least seven years. The court may then extend its jurisdiction over one or more of the defendants if the court determines that any of the defendants has not fulfilled its specific obligations under the decree, or the ACHA's low-income housing programs are not desegregated to the extent practicable.

### III. *Approval of the Consent Decree*

### A. Standard

■ Under Rule 23(e) of the Federal Rules of Civil Procedure, a class action settlement must meet with the approval of the court. In exercising its sound discretion, the court must determine whether the settlement is fair, adequate, and reasonable. *Walsh v. Great Atlantic & Pacific Tea Co., Inc.,* 726 F.2d 956, 965 (3d Cir.1983). Relevant to this determination are the following factors:

> ... (1) the complexity, expense and likely duration of the litigation ...; (2) the reaction of the class to the settlement ...; (3) the stage of the proceedings and amount of discovery completed ...; (4) the risks of establishing liability ...; (5) the risks of establishing damages ...; (6) the risks of maintaining the class action through the trial ...; (7) the ability of the defendants to withstand a greater judgment; (8) the range of reasonableness of the settlement fund in light of the best possible recovery ...; (9) the range of reasonableness of the

settlement fund to a possible recovery in light of all attendant risks of litigation. ...

*Girsh v. Jepson,* 521 F.2d 153, 157 (3d Cir. 1975). We now proceed to an examination of these factors.[3]

### B. Evaluation of the Consent Decree

### 1. Complexity, Expense and Likely Duration of the Litigation.

Litigation of the constitutionality of the housing policies and practices of the defendants spanning the last five decades has been complex and burdensome. It is anticipated that a trial of this matter would last for three weeks or more. To determine the constitutionality of the policies and the practices of defendants, the court would have to hear evidence on the alleged role of HUD's predecessor agencies and the local defendants establishing public housing on a segregated basis, their perpetuation of and failure to dismantle the vestiges of housing segregation existing throughout Allegheny County and the degree of segregation in public and assisted housing that has injured class members. Expert testimony would be offered to explain the degree of segregation measured in Allegheny County's public and assisted housing programs and the private market, and the remedies required to dismantle that segregation, which would be complicated, time consuming, and expensive.

### 2. The Reaction of the Class to the Settlement.

■ Class members were provided with individual notice of the provisions of the consent decree and the right to file timely objections. Of 9,455 residents of and applicants for ACHA housing that were mailed notices, approximately 5,000 of those are projected to be class members, i.e., African Americans. As of November 15, 1994, the deadline for filing objections or comments to the consent decree, the court received five submissions. Of the five submissions, two responses were from non-class members who claimed they were not interested. Given the fact that only

---

**3.** The factors relating to the risks of establishing damages and of maintaining the class action through the trial are inapplicable to this litigation. Plaintiffs have not sought damages in this

action. Also, because the litigation was settled on the eve of trial, there was no risk that a class action would not be maintained.

one of the other three submissions was referenced as an objection, out of a class of 5,000, 99.98% of the class appears to favor the agreement. Overwhelming support of the class for the decree weighs heavily in favor of the adequacy of the settlement. *See Metropolitan Pittsburgh Crusade of Voters v. Pittsburgh,* 686 F.Supp. 97, 101 (W.D.Pa. 1988). Although the three submissions deserve the court's thoughtful consideration, they do not warrant disapproval of the consent decree.

One class member, Willa Mae Koon, raised a complaint about the ACHA because of the delay inherent in receiving an offer of Section 8 assistance, which was not relevant to the adequacy of the decree. There is no basis for assuming that the decree will affect the length of time individuals must wait to receive Section 8 certificates.

Another class member, Leah Evans, complained about the lack of affordable, safe housing available for the use of Section 8 assistance. The consent decree provisions calling for the enforcement of HUD's Housing Quality Standards, designed to ensure that Section 8 is used to subsidize only decent, safe, and sanitary housing, and the provision of counseling, marketing and outreach by the FHSC actually aim to increase the number of landlords willing to accept Section 8 assistance for decent, safe, and sanitary units in non-impacted neighborhoods.

Finally, the submission of Davida Brooks, the only class member submission referenced as an "objection," appears to point out the value of living in a black community and to express concern over an insufficient number of black communities. It is unclear whether this class member currently lives in what she considers a "black community" and would like to remain in that community, or whether she would like the option to choose among a greater number of communities open to African Americans. The decree addresses both concerns. First, it sets out to improve black communities in which a substantial number of federally subsidized units are sited. These communities generally have undergone decline and disinvestment. The decree, therefore, attempts to target improvements to identifiably African American public housing developments and the neighborhoods in which they are located to equalize conditions at all developments and neighborhoods and to provide for community and economic development.

Second, the consent decree seeks to maximize the number of communities open to African American residents of or applicants for public housing or Section 8 rental assistance. The FHSC will provide class members with counseling and support services to help each individual consider public and federally assisted housing and the use of Section 8 certificates in neighborhoods that provide enhanced educational, employment, commercial, and social opportunities.

### 3. The Stage of the Proceedings and the Amount of Discovery Completed.

The consent decree in this case has been reached only after extensive investigation, research, discovery, and briefing. Full discovery included written discovery, document production, and depositions. All parties submitted motions for summary judgment, pretrial statements, and proposed findings of fact and conclusions of law. Because all pretrial preparations have been completed, the parties and the court are in the best possible position to evaluate the risks of establishing liability and the extent of relief that may be awarded after a trial and thus to determine whether the decree is fair, adequate, and reasonable.

### 4. The Risks of Establishing Liability.

Plaintiffs' counsel recommended approval of the consent decree not because of any perceived weakness in their case against HUD, the ACHA, the County, or the RAAC. Rather, because of the strength of plaintiffs' case and the liability already established through HUD's stipulation, the parties negotiated a decree affording the class with comprehensive relief. The comprehensive relief provided by the decree satisfies the factors relevant to determining the decree's fairness and also obviates the need for full litigation of liability and remedy.

5. The Range of Reasonableness of the Settlement Fund in Light of the Best Possible Recovery and the Attendant Risks of Litigation.

The court has determined that the relief provided in the decree is well within the range of reasonableness in light of the best possible recovery and the attendant risks of litigation. *Harris v. Pernsley,* 654 F.Supp. 1042, 1052 (E.D.Pa.1987).

The Supreme Court has considered appropriate remedies for long-standing segregation in housing. In *Hills v. Gautreaux,* 425 U.S. 284, 96 S.Ct. 1538, 47 L.Ed.2d 792 (1976), the Court found that once a constitutional violation is shown "the scope of a district court's equitable powers to remedy past wrongs is broad," *id.* at 297, 96 S.Ct. at 1546 (quoting *Swann v. Charlotte–Mecklenburg Board of Education,* 402 U.S. 1, 15, 91 S.Ct. 1267, 1275–76, 28 L.Ed.2d 554 (1971)), and "all reasonable methods [are] available to formulate an effective remedy." *Id.* (quoting *North Carolina State Board of Education v. Swann,* 402 U.S. 43, 46, 91 S.Ct. 1284, 1286, 28 L.Ed.2d 586 (1971)). The Court requires that "every effort should be made by a federal court to employ those methods to achieve the greatest possible degree of [relief], taking account the practicalities of the situation." *Hills,* 425 U.S. at 297, 96 S.Ct. at 1546 (quoting *Davis v. Board of School Commissioners,* 402 U.S. 33, 37, 91 S.Ct. 1289, 1292, 28 L.Ed.2d 577 (1971)).

The parties labored intensively to draft provisions designed to desegregate the ACHA's housing programs and provide class members decent, affordable, and racially integrated public housing opportunities. The result of this effort is a decree that provides the most comprehensive relief to date for victims of housing segregation and discrimination.

For example, the decree provides substantial equitable relief that will alter the way in which tenants are selected and assigned to various public and assisted housing units. The waiting lists for Section 8 and public housing will eventually be merged so that applicants from one central list will be offered either type or both types of housing assistance, and so that the Section 8 list will no longer provide a means of escape for those wishing to avoid desegregative moves. Counseling will be provided to all applicants receiving an offer or offers of public or assisted housing, and supportive services will be provided to assist applicants in finding landlords willing to accept Section 8 certificates or in adjusting to new and unfamiliar neighborhoods.

Significantly, HUD will help to encourage assisted housing owners or operators to fill vacancies through the FHSC by offering them a safe harbor from HUD monitoring of the owner's compliance with affirmative fair housing marketing obligations. This provision will help to increase both the number of assisted housing units available for desegregation and the overall housing opportunities of class members.

The decree also creates a mechanism for the siting of the 100 replacement units demolished at Talbot Towers and for all other new units to be constructed in the County. All new units are to be scattered site units (twelve or less) to eliminate the use of public housing as a means of concentrating and isolating African Americans in the County. Also, because the inability of the ACHA to obtain cooperation agreements with municipalities has worked to prevent the construction of public housing in much of the County, resulting in the racial segregation of public housing and the neighborhoods in which it is located, the decree provides that the County is an appropriate entity to enter into cooperation agreements with the ACHA. This provision will provide class members with desegregative housing opportunities that they previously have been denied.

With regard to resources to be spent to accomplish desegregation, the class will receive the benefit of a substantial portion of the discretionary funds available to the Secretary of HUD, which is 5% of the total housing assistance available to HUD. 42 U.S.C. § 1439(a)(1). These discretionary funds are distributed "in support of desegregation efforts," 42 U.S.C. § 1439(d)(4)(A), as well as among communities with housing needs resulting from natural disasters, emergencies, and the settlement of litigation.

As previously noted, the decree provides the class with 450 desegregative Section 8 certificates to help remedy the lack of decent, affordable and rationally integrated housing opportunities in Allegheny County.

The decree also generates federal and local resources for the replacement of 100 units that were demolished at Talbot Towers. These units, like all new units built in the County, are to be scattered site units. In addition, the decree contemplates additional public housing to replace demolished, obsolete or dilapidated housing, which will entail the future commitment of HUD's budget authority.

The decree requires Allegheny County to set aside 25% of its annual, allocable Community Development Block Grant ("CDBG") funds for seven years to be targeted to seven municipalities to which African American use of public housing and Section 8 has been confined: Clairton, Duquesne, Rankin, Braddock, McKees Rocks, Homestead, and Wilkinsburg. Based on recent CDBG allocations, the decree will cause roughly $4,000,-000.00 per year for seven years to flow through community based organizations to be spent in neglected African American communities in Allegheny County.

The decree also requires the County to set aside 25% of its existing, unencumbered CDBG funds as of July 1994, for funding of the FHSC and the Task Force until April 1995 and for targeted projects thereafter. From April 1995, the decree requires the County to use, over and above the 25% set aside, $500,000.00 annually for funding of the FHSC and the Task Force. The decree also requires that HUD provide funding for the FHSC in the amount of $200,000.00 for the first year and up to $200,000.00 per year for the succeeding six years.

The decree also is written to ensure that those resources defendants are required to spend for seven years to accomplish desegregation are used to leverage other federal, state, and private funds. Defendants must specifically apply for all reasonably available assistance that would materially assist in performing the activities, objectives, and purposes called for in the decree.

Thus, as the decree provides class members with wide array of housing and community development opportunities, it falls within the range of reasonableness.

### 6. Other Factors.

The consent decree is the result of good faith, arms' length negotiations. *Harris,* 654 F.Supp. at 1049. The parties participated in extensive negotiations from the time the court set the matter for trial in late May 1994, until the time that the decree was preliminarily approved on August 31, 1994. The decree is the result of intense, adversarial negotiations that involved not only each HUD Assistant Secretary, but also the Associate Attorney General of the United States.

Furthermore, in evaluating the consent decree, the court may lend significant weight to the professional judgment of counsel participating in the litigation. *Id.* at 1055. In this case, the consent decree was negotiated and recommended by the court by highly experienced counsel, knowledgeable of civil rights class action litigation generally and housing desegregation litigation specifically.

### IV. *Conclusion*

Because of the substantial discovery undertaken in this litigation, the complexity of the issues, the support of the class for the relief, HUD's stipulated liability under Title VIII, and the fact that this may be the most comprehensive consent decree of its kind, the court finds that the decree is fair, adequate and reasonable as a resolution of this litigation.

### APPENDIX
### TABLE OF CONTENTS

I.     INTRODUCTION AND PURPOSE..............................................225

II.     DEFINITIONS ...........................................................226

 A.   Non–Racially Identifiable Federally Subsidized Housing Developments..............226
 B.   Non–Racially Identifiable Elderly Public Housing Development ...................227
 C.   Impacted Neighborhoods .................................................................227
 D.   Desegregative Housing Opportunity ...............................................227
 E.   Community–Wide Waiting List.......................................................227
 F.   Good Cause for Refusal of an Offer...............................................227
 G.   Class Member ...............................................................................227
 H.   Task Force........................................................................227
 I.   Scattered Site Housing ....................................................................228

III.   REPLACEMENT UNITS ...............................................................228

 A.   Jefferson Borough Units..............................................................228
 B.   Sites for Remaining Units ..............................................................229
 C.   Cooperation Agreements for New Public Housing ...............................229

IV.   PHYSICAL IMPROVEMENTS TO PUBLIC HOUSING DEVELOPMENTS AND THE SURROUNDING NEIGHBORHOODS TO ACCOMPLISH EQUALIZATION.....229

 A.   Tenant Survey...............................................................................229
 B.   Physical Improvements To Public Housing Developments...........................230
 C.   Physical Improvements to the Neighborhoods Surrounding Public Housing Developments and Infrastructure Improvements ...................................231

V.   OTHER MEASURES DESIGNED TO STABILIZE AND EQUALIZE PUBLIC HOUSING DEVELOPMENTS AND THE SURROUNDING COMMUNITIES........231

 A.   Federal, State and Privately Funded Programs .................................232
 B.   Competitive Federally Funded Programs........................................232
 C.   Obligations of the Parties .............................................................232
 D.   Allegheny County Community Development Block Grant Budget...................232
 E.   Transportation ...........................................................................233
 F.   Police Protection...........................................................................233
 G.   Anti–Crime Programs ..................................................................234
 H.   Magnet Developments .................................................................234
 I.   Demolition and Replacement of Dilapidated Public Housing Units.................234

VI.   WAITING LIST INITIATIVES ...........................................................234

 A.   Community Wide Waiting List .....................................................235
 B.   Housing Opportunities Waiting Lists .............................................235
 C.   Offers...........................................................................................235
 D.   Transfers ...................................................................................236
 E.   Tenanting of New Housing ...........................................................237
 F.   Good Cause Review Board .............................................................237
 G.   Waiting List Monitoring ...............................................................237

VII.   HOUSING MOBILITY PROGRAM ...................................................238

 A.   Fair Housing Services Center.......................................................238
 B.   Section 8 Mobility Program...........................................................238
 C.   HUD Assisted Housing.................................................................239

VIII.   HOUSING OPPORTUNITIES ANALYSIS .........................................242

IX.   ENFORCEMENT...........................................................................243

 A.   Injunction and Continuing Jurisdiction .........................................243
 B.   Enforcement...............................................................................243
 C.   Implementation and HUD Enforcement.......................................244

X.   LIMITATIONS BASED ON THE AVAILABILITY OF FEDERAL FUNDING ........245

XI.   ATTORNEYS FEES .......................................................................245

XII.   ADJUSTMENT IN ACHA OPERATING SUBSIDIES .............................245

    A.   Current and Past Years ...............................................245
    B.   Future Years .........................................................246

## CONSENT DECREE

## I.  INTRODUCTION AND PURPOSE

1.  Plaintiffs have asserted claims in this action against the United States Department of Housing and Urban Development ("HUD"), the County of Allegheny ("County"), the Allegheny County Housing Authority ("ACHA"), and the Redevelopment Authority of Allegheny County ("RAAC") (collectively "Defendants") asserting that each had a role in the establishment of *de jure* racial segregation in public and other federally assisted housing and residential housing patterns in Allegheny County, and that each has failed to disestablish and has perpetuated that racial segregation, in violation of the Fifth and Fourteenth Amendments to the Constitution of the United States, Title VI of the Civil Rights Act of 1964, Title VIII of the Civil Rights Act of 1968, 42 U.S.C. §§ 1981, 1982 and 1983, and other federal statutes, regulations, and guidelines.

2.  A Plaintiff class was certified in this action on October 15, 1992, defined as all African–American residents in, or applicants for, public housing assisted by the ACHA or HUD, who have been and continue to be denied decent, affordable, and racially integrated public housing opportunities.

3.  HUD has stipulated to certain liability in this action under § 808(e)(5) of Title VIII, 42 U.S.C. § 3608, with respect to a failure to eliminate racial segregation in tenant selection and assignment in the conventional public housing program of the ACHA for the period from 1984 through April 1991. In addition, in a Final Investigative Report resulting from a 1991 compliance review of the ACHA, HUD made findings that the ACHA was in violation of Title VI and the regulations thereunder for the creation and perpetuation of racial segregation in its conventional public housing through its site selection, occupancy, waiting list, tenant selection and assignment, transfer, and other policies and practices, and that current and continuing practices perpetuated the intentional segregation practiced by the ACHA prior to 1965. HUD has not otherwise acknowledged any liability for the actions or practices raised in Plaintiffs' claims.

4.  Although the ACHA did not agree with HUD's findings in the Final Investigation Report, or as to the need for desegregation of its developments, it agreed to resolve voluntarily the preliminary finding of non-compliance with Title VI and, without admitting to any violation of Title VI, agreed and consented to enter into a Voluntary Compliance Agreement with HUD. The ACHA has not acknowledged any liability for the actions or practices raised in Plaintiffs' claims.

5.  The County of Allegheny has not acknowledged any liability for the actions or practices raised in Plaintiffs' claims and enters into this Decree solely in consideration for the resolution of the claims against it and to the extent of its obligations herein.

6.  The Redevelopment Authority of Allegheny County has not acknowledged any liability for the actions or practices raised in Plaintiffs' claims.

7.  Extensive investigation, discovery, and pretrial preparation has been undertaken in this action, in addition to the administrative process undertaken by HUD and previous administrative proceedings by the Pennsylvania Human Relations Commission. This action is scheduled for trial and all pretrial preparations have been completed.

8.  The parties, or various combinations of them, have discussed the settlement of this action virtually throughout the litigation; indeed, some issues in this action were resolved or partially resolved by agreement of the parties early in the litigation. After lengthy negotiations, the parties have determined to forego trial and reach a comprehensive resolution of the Plaintiffs' claims and the Defendants' defenses by entering into this Consent Decree. Therefore, the parties have agreed to the entry of this Consent Decree as an Order of this Court and to the

terms of the Desegregation Plan for Allegheny County that it sets forth.

9. The purpose of this Consent Decree and the Desegregation Plan it includes (hereinafter "Decree") is to set out a series of actions to be taken, and studies to be undertaken and further plans to be designed and implemented, to desegregate the ACHA's housing programs, to increase desegregative housing choices and opportunities for class members and other low-income residents of Allegheny County, and to decrease residential racial segregation and racial spatial separation for all residents of the County.

## II. DEFINITIONS

### A. Non–Racially Identifiable Federally Subsidized Housing Developments

1. **A non-racially identifiable family public housing development** is one in which the African–American population of the development is between 38 and 58 percent.

2. **A non-racially identifiable assisted housing development** is a Section 8 development, Section 8 moderate rehabilitation development, and § 221(d)(3) Below–Market Interest Rate (BMIR) or § 236 development that is affordable to the Plaintiff class (see 42 U.S.C. § 1437a(a)), not restricted to occupancy by the elderly, in which the African–American population is between 38 and 58 percent.

3. **An identifiably African–American development** is one in which the percentage of African–American population exceeds 58%. **An identifiably white development** is one in which the percentage of African–American population is less than 38%.

4. **Calculation and adjustment of the standard.** The 38 to 58 percent range is derived from examination of the 1991 racial composition in the ACHA's family public housing program, Section 8 program, and the combined Low Income Family Public Housing (LIPH) and Section 8 waiting lists. The range is equal to 10 percent above or below the 1991 African–American family tenant and applicant population of 48 percent. HUD shall reevaluate and modify the standard, if necessary, because of a significant change in the racial composition of the family tenant population or applicant pool or upon the availability of data regarding the racial composition of tenant and applicant populations of other assisted housing in Allegheny County participating in the single waiting list described in section VI.A.

5. **Adjustments within standard.** In applying the 38–58 percent standard at a particular development, appropriate adjustments may be made to take into account the effect of the racial composition of the development on the neighborhood, so that the desegregation of the development can facilitate the desegregation of the neighborhoods. Adjustments would be appropriate to accomplish the following: (1) white occupancy at the high end of the range in identifiably African–American developments in impacted neighborhoods; and (2) African–American occupancy at the high end of the range in identifiably white developments in non-impacted neighborhoods. Such adjustments are appropriate to desegregate the development and introduce a critical mass of opposite race residents into these communities.

6. **Limitations.** A development will not be considered non-racially identifiable if a pattern of segregation exists within a portion of the development.

7. **Scattered Site Developments.** Scattered site developments shall conform to the above standard of non-racially identifiable public or assisted housing developments, except that developments with between one and five units shall be tenanted and occupied as follows: developments with five units may have four or three African–American families, developments with four units may have three or two African–American families, developments with three units may have two African–American families, and developments with two units may have one African–American family. Under no circumstances is newly developed, scattered site housing to be tenanted only by one race unless there is only one unit on a particular site. Sites in non-impacted neighborhoods with one unit shall be tenanted by an African–American family.

**B. Non–Racially Identifiable Elderly Public Housing Development**

1. **A non-racially identifiably elderly public housing development** is one in which the African–American population of the development is within 10 percent of the combined total percentage of elderly African Americans in occupancy and on waiting lists of the ACHA, adjusted for the difference between the percentage of the income-eligible African–American elderly population in the jurisdiction of the Allegheny County Housing Authority (eligibility), and the percentage of elderly African Americans in occupancy in the ACHA (utilization).

2. The adjustment in the range is made to account for the existing white racial concentration in elderly developments that is attributable in part to the historically segregated character of many of the elderly developments; and the segregated character of many of the elderly development sites.

**C. Impacted Neighborhoods**

**Impacted neighborhoods** are the following census tracts: 4923, 5606, 4869, 5604, 5232, 4824, 5170, 5611, 5615, 4928, 4868, 4882, 4881, 5153, 5612, 5614, 4838, 4440.99, 4508, 4560.01, 4940, 5231.98, 5138, 5129, 4644, 5211, 5151, 5235.01, 5140, 5610, 5128, 4867, 4451, and 5041.

The remaining areas of the ACHA's jurisdiction are referred to herein as non-impacted neighborhoods. As additional census or other data become available, the parties may agree on adjustments to include comparable neighborhoods in, or to remove neighborhoods from, the above list.

**D. Desegregative Housing Opportunity**

A **desegregative housing opportunity** is (1) an offer of a suitable unit in a public housing development that is not racially identifiable as to the race of the person given the opportunity, (2) an offer from an assisted housing development owner to obtain a suitable unit in an assisted housing development that is not racially identifiable as to the race of the person given the opportunity, (3) the use of a Section 8 certificate or voucher after appropriate mobility counseling by the Fair Housing Services Center to encourage desegregative housing choices, or (4) the use of one of the 450 desegregative certificates provided through the Section 8 mobility program described in section VII.B.1. An offer of a voucher or certificate under (3) and (4) must include the identification of at least one landlord, willing to accept a Section 8 certificate or voucher holder referred by the FHSC, with at least one appropriately sized unit in a non-impacted neighborhood that meets Section 8 program standards.

**E. Community–Wide Waiting List**

A **community-wide waiting list** for purposes of 24 C.F.R. § 1.4(b)(2)(ii) is one waiting list that serves the Authority's entire area of jurisdiction.

**F. Good Cause for Refusal of an Offer**

**Good cause for refusal of an offer** exists when an applicant can demonstrate through objective evidence that a move into the unit offered would result in a unique hardship related to the ability of the applicant (or a member of the applicant's family) to retain his or her employment, to secure or retain peculiarly available day care or medical services, or in accordance with guidelines to be developed by the Review Board. (See section VI.F., below). Nothing in this provision affects the obligation of ACHA to reasonably accommodate a disability of the applicant or a member of his or her family.

**G. Class Member**

A **class member** is any African–American current resident in, or applicant for, public housing assisted by the ACHA or HUD, who allegedly has been and continues to be denied decent, affordable, and racially integrated public housing opportunities. *See* October 15, 1992 Order. An applicant or tenant that has an African–American or biracial African–American family member shall be considered a class member.

**H. Task Force**

1. The parties to this action shall create a **Task Force** in order to perform certain functions in connection with the implementation

of the remedies set forth herein. The Task Force shall be composed of representatives of each of the defendants, designees of counsel for the Plaintiff class, representatives of the Fair Housing Services Center created by the terms of this Consent Decree, and such other representatives of non-profit organizations, community-based organizations and community development corporations that HUD and the Plaintiffs may jointly select. The Task Force shall act on the basis of consensus, but may not act without the concurrence of the designees of the Plaintiff class and the representative of HUD. In connection with the selection and approval of sites, and the application for or selection of projects to be funded, as discussed in section V.D., the Task Force representatives of Allegheny County shall have no authority or responsibility for, and shall not participate in decisions of, the Task Force, and Allegheny County is obligated to perform only those functions otherwise performed in connection with the preparation and administration of federal, state and local programs. With respect to specific aspects of the projects or activities approved by HUD as part of the Task Force, the County shall be held harmless from any subsequent determination of noncompliance with any statutory or regulatory requirements. The County shall otherwise administer Task Force Projects as a part of the County CDBG program according to the administrative and financial guidelines applicable to that program. The County shall notify, in the normal course, the Task Force and HUD of any perceived impropriety identified through that normal monitoring and administrative process.

2. The Task Force shall:

a. coordinate the selection of and approve the sites for new and replacement units of family public housing, as set forth in sections III.B, V.I., and VIII.;

b. conduct a study to identify barriers to desegregative choices, identify mechanisms for the targeting of resources, and identify and develop a plan of housing and community and economic development activities and opportunities, as set forth in section IV.C.;

c. approve all projects and expenditures provided for in sections IV. and V. as implementing the Task Force plan in section b., above;

d. make a report identifying those developments that shall be designated as "magnet developments" pursuant to section V.H.; and

e. assist HUD in performing the Housing Opportunities Analysis as set out in section VIII.

3. The defendants shall furnish the Task Force with necessary and appropriate information, cooperation, and available technical assistance. The Task Force shall retain the services of such planners and other professionals, not employees of the defendants, as may be required to conduct complete studies and design effective plans. The activities of the Task Force shall be funded through Community Development Block Grant funds administered by Allegheny County, as approved by HUD, and may be funded through other grants that the Task Force may seek.

### I. Scattered Site Development

A scattered site development is one with between one and twelve units.

### III. REPLACEMENT UNITS

#### A. Jefferson Borough Units.

HUD has provided funding to the ACHA for the construction of 100 units of public housing to replace the units demolished at Talbot Towers. Jefferson Borough entered into a Cooperation Agreement with ACHA that allowed forty-four of the replacement units to be constructed in Jefferson Borough. Within 60 days of the adoption of this Decree by the Court, representatives from the ACHA and the Task Force will meet with appropriate representatives from Jefferson Borough to resolve any concerns the Jefferson Borough may now harbor about the replacement units and to ensure that construction of up to 44 units begins as expeditiously as possible. If the Jefferson Borough refuses to honor its Cooperation Agreement and facilitate the construction, HUD will take appropriate enforcement action against the Jefferson Borough.

### B. Sites for Remaining Units.

Within 180 days of the entry of this Decree, the ACHA and the Task Force will complete a study of various desegregative sites throughout the County and shall select a variety of locations for the balance of the 100 replacement units. The Task Force shall choose among locations that provide desegregative housing opportunities in accordance with section VIII., below. These units, those to be developed in Jefferson Borough, and other new or replacement units must be scattered-site housing.

### C. Cooperation Agreements for New Public Housing.

1. HUD advises ACHA and Allegheny County that, in light of the claims presented in this litigation, based on applicable federal and Pennsylvania law, and the established practice and usage regarding cooperation agreements, Allegheny County is the appropriate unit of government with which the ACHA should enter into such cooperation agreements. Therefore, Allegheny County shall execute cooperation agreement(s), (which term includes one or more non-site specific cooperation agreements), in conformity with regulatory requirements, with the ACHA for the new public housing units called for in this Decree and hereafter developed in the jurisdiction of the ACHA. Such cooperation agreement(s) shall not obligate the County to (i) provide any municipal service not otherwise provided by the County, (ii) exercise any municipal function not exercised by the County, or (iii) enforce any municipal obligation.

2. If the sites selected for new public housing are in municipalities that do not voluntarily enter into cooperation agreements with the ACHA for the construction of the new units, the ACHA may, with the assistance of the parties hereto, seek to obtain cooperation agreements from those municipalities. In the event any municipality that is not a party to such a cooperation agreement refuses to extend the necessary or appropriate cooperation in the development or acquisition of the new public housing

units or refuses to provide services to a development:

    a. the ACHA shall take all appropriate action to enforce the obligations imposed by law;

    b. HUD may initiate appropriate action against the municipality, including, but not limited to, the withholding or conditioning of federal funds or the commencement of a Secretary-initiated complaint under the Fair Housing Act; and

    c. Any party to this action may initiate any appropriate proceedings to secure enforcement of this Decree under federal or state law consistent with the provisions of section IX., below.

### IV. PHYSICAL IMPROVEMENTS TO PUBLIC HOUSING DEVELOPMENTS AND THE SURROUNDING NEIGHBORHOODS TO ACCOMPLISH EQUALIZATION

Desegregation of the ACHA's public housing developments has been hindered in the past in part by disparities between the physical plant and neighborhood conditions of identifiably white and identifiably African–American developments and between developments in non-impacted and impacted neighborhoods. Further, experience demonstrates that the reluctance of applicants and tenants to make desegregative moves, particularly to identifiably African–American developments, has impeded desegregation efforts. Therefore, the parties to this Decree shall undertake to equalize the conditions at all public housing developments and in their surrounding neighborhoods and provide physical improvements and amenities as inducements to desegregative housing choices. To accomplish this goal, the following actions shall be taken:

### A. Tenant Survey.

HUD, in cooperation with Plaintiffs' counsel and the ACHA, will prepare and administer a comprehensive survey of a statistically significant segment of the ACHA's tenants and applicants on both the LIPH and Section 8 waiting lists (both class members and non-class members) to assist in determining the following:

1. the amenities at some public housing developments needed at other public housing developments to accomplish equalization among the developments;

2. the conditions in the neighborhoods surrounding public housing developments and needed improvements to those conditions;

3. the improvements and amenities that will motivate tenants to make desegregative moves, with special attention to elderly African Americans who may have been discouraged from applying for elderly public housing; and

4. the amenities that would make magnet developments effective.

## B. Physical Improvements To Public Housing Developments.

To accomplish the goal stated in the introduction to this section, HUD will inspect the identifiably white and non-racially identifiable public housing developments and develop a list of amenities enjoyed by the tenants at those developments. This list of amenities may be modified, based on input from the Plaintiffs and on the information gathered by the tenant survey. A final list of the amenities that shall be provided at all public housing developments will be provided to the ACHA.

1. **Funding Physical Improvements to Public Housing Developments.** The ACHA shall, in consultation with HUD and Plaintiffs' representatives, establish priorities among the amenities included in the final list prepared by HUD and shall expend its modernization funding in accordance with those priorities.

a. HUD has provided the ACHA with Comprehensive Grant Program funds for the purpose of modernizing the public housing developments within its jurisdictions. ACHA will carry out its modernization program according to the terms of its Voluntary Compliance Agreement (VCA) of July 29, 1992.

b. Any modernization plan approved (subsequent to the plan approved pursuant to the VCA) shall, to the extent possible, address the above list of priority amenities as part of the modernization at any public housing developments.

c. Future modernization funding decisions shall ensure that the final list of amenities are provided at the public housing developments that do not have them. Notwithstanding this provision, ACHA shall maintain its developments as decent, safe, and sanitary as required by 42 U.S.C. §§ 1437, et seq. The amenities shall first be provided at all developments that are identifiably African–American. To the extent that it is determined that desegregation objectives are not being attained at developments that are identifiably African–American, the ACHA shall identify additional improvements or amenities to be provided and shall make every effort to seek additional funds to accomplish such improvements. Nothing herein shall be construed as requiring HUD to provide additional funding. The ACHA's findings and any modernization plans shall be submitted to the Court and the parties.

2. **Housing Quality and Accessibility Standards.** In addition to providing the above amenities, the ACHA will ensure that *all* public housing developments meet or exceed Housing Quality Standards (HQS) and relevant accessibility standards (24 C.F.R. §§ 8.20, et seq.). Following input from the other parties, the ACHA shall prepare a listing of HQS deficiencies and develop and carry out a plan to eliminate those deficiencies. The findings and plan shall be submitted to the Court and the parties. Where necessary, the ACHA may use HUD-provided Comprehensive Grant Program funding for the inclusion of safety and security measures, including lighting and fences.

3. **Maintenance.** The ACHA shall also eliminate all disparities in maintenance services among the various developments and shall bring all developments up to the highest standard found among the identifiably white developments. This standard will be determined by HUD after a review of the history of maintenance services at the public housing developments and an on-site review of the conditions at all developments. HUD shall provide the ACHA and the parties with a report of its findings, setting out specific

disparities and conditions to be corrected. The conditions to be addressed and implementation of the ACHA plan will be reviewed periodically to ensure that the level of services remains comparable. The ACHA shall prepare and submit a plan to eliminate the disparities, which shall be submitted to the parties and the Court.

C. **Physical Improvements to the Neighborhoods Surrounding Public Housing Developments and Infrastructure Improvements.**

1. **General Neighborhood Improvements.** In an effort to eliminate disparities and promote desegregative housing choices, HUD will improve the vicinity surrounding ACHA family public housing developments by demolishing any vacant buildings that it now owns or may acquire in the future, if HUD determines that: (1) the housing is not needed; and (2) demolition would remove a source of blight from the vicinity. In the neighborhoods surrounding public housing developments, HUD will expedite the repair and/or sale of HUD-owned multi-family and single family property. If HUD expects to be owner of such a multi-family property for more than nine months, HUD will adopt and implement a Section 3 employment policy to provide employment opportunities for low-income property and neighborhood residents in the management, maintenance, and rehabilitation of the properties.

2. **Improve Infrastructure.** The ACHA shall, with such assistance as the parties may provide, through enforcement of a cooperation agreement with each local municipality in which an ACHA development is located, or otherwise, require the municipality to serve the ACHA developments with streets, lighting, and other elements of public infrastructure to the standard found in other stable neighborhoods in the local municipality where an ACHA development is not located. In neighborhoods surrounding ACHA developments, which neighborhoods show signs of deterioration, ACHA will require the municipality to institute a program of code enforcement to control the deterioration. Where appropriate, the County will assist municipalities in providing help to homeowners eligible for assistance to repair their housing code violations and otherwise support housing rehabilitation and stabilization efforts. To the extent these obligations exceed a municipality's resources, it may apply to the County and the Task Force for Community Development Block Grant funds. The Task Force may consider such requests in performing its functions described in section V.D., below.

3. **Housing and Community and Economic Development Activities.** The Task Force will study the neighborhoods within municipalities in which historically or identifiably African–American public housing exists, and municipalities in which high concentrations of Section 8 tenant-based assistance are utilized by African Americans. These municipalities are Clairton, Duquesne, Rankin, Braddock, McKees Rocks, Homestead, and Wilkinsburg. The Task Force shall identify federal, state, and local enforcement provisions, programs, and resources that could be utilized, and means of targeting such programs and resources to eliminate deterioration and provide non-deep subsidy housing, and identify community and economic development opportunities in those areas, to make such areas and the public and Section 8 housing they contain more attractive and desirable for desegregative moves. The Task Force in targeting resources under this paragraph shall give the first priority to neighborhoods surrounding public housing developments. The Task Force shall prepare and submit to the parties and the Court a report of its findings and a plan, and supplement, as necessary, specific recommendations regarding the above. The Task Force will also be responsible to make a report and recommendation on the developments that may be designated magnet developments (see section V.H.).

V. **OTHER MEASURES DESIGNED TO STABILIZE AND EQUALIZE PUBLIC HOUSING DEVELOPMENTS AND THE SURROUNDING COMMUNITIES**

Concurrent with the implementation of the equalization measures described above, the parties will undertake to eliminate, to the

extent possible, any vestiges of discrimination that exist with regard to the ACHA's assisted housing developments. In particular, HUD will exercise its discretion to this end, as appropriate, including, but not limited to, the authority of the Assistant Secretary for Fair Housing and Equal Opportunity to initiate investigations under the Fair Housing Act, as described in section IX., below.

### A. Federal, State and Privately Funded Programs

HUD, ACHA, Allegheny County, and RAAC will identify and encourage, or apply for and utilize, to the extent practicable, available Community Development Block Grant (CDBG), HOME, Family Self–Sufficiency (FSS), Section 107 (Special Purpose Grants), Section 108, and other Federal resources (e.g., funds from the Departments of Energy, Education, Transportation, Labor, Health and Human Services, Agriculture, etc.), including employment opportunities through the implementation of Section 3, for non-deep subsidy housing and community and economic development in neighborhoods in which historically or identifiably African–American public housing exists and municipalities in which high concentrations of Section 8 tenant based assistance are utilized by African Americans (Clairton, Duquesne, Rankin, Braddock, McKees Rocks, Homestead, and Wilkinsburg). ACHA, the County, RAAC and the Task Force shall also actively seek out, apply for, and, if received, target to these neighborhoods funds reasonably available under any other appropriate federal, state, or privately-funded programs, including but not limited to, programs of the Pennsylvania Department of Community Affairs, Fannie Mae, Pennsylvania Housing Finance Agency and the Low–Income Housing Tax Credit Program. The first priority of this section shall be on neighborhoods surrounding public housing developments.

### B. Competitive Federally Funded Programs

To the extent not already provided for in funding programs for which HUD establishes or is required to establish competitive criteria on the bases of which applications for funding are granted, HUD will review competitive programs and assess the feasibility, impact, and effect of establishing a process that provides competitive advantage to applications designed to remedy vestiges of segregation in public housing programs that have been found to be segregated in a HUD Title VI review.

### C. Obligations of the Parties

1. Allegheny County, to secure funding for the Task Force, shall apply to HUD for a technical assistance grant pursuant to section 107(b)(4) of the Housing and Community Development Act of 1974. The County shall also apply for all reasonably available assistance, and for assistance under programs and sources of funding that become available under Court approval of the Decree, that would materially assist in performing the activities, objectives, and purposes called for in this Decree.

2. The ACHA shall apply for all reasonably available assistance, including modernization and new construction, and for assistance under programs and sources of funding that become available after Court approval of the Decree, that would materially assist in performing the activities, objectives, and purposes called for in this Decree.

3. RAAC shall apply for reasonably available assistance, and for assistance under programs and sources of funding that become available after Court approval of the Decree, that would materially assist in performing the activities, objectives, and purposes called for in this Decree at the request and direction of the Task Force.

### D. Allegheny County Community Development Block Grant Budget

1. In addition to the above, Allegheny County shall set aside for expenditure on projects selected by the Task Force, and approved by HUD, 25% of its existing unencumbered CDBG funds, as of July 19, 1994, and an amount equal to 25% of its future annual allocable CDBG funds. "Allocable CDBG Funds" are the total amount of CDBG funds less actual Allegheny County administrative expenses. These funds shall be ex-

pended for housing and community and economic development programs (section IV. C.3.) and infrastructure improvements (section IV.C.2.), in accordance with the plan proposed by the Task Force, for seven consecutive years, commencing April 1995. The County shall have no financial obligation to fund any such amount other than from CDBG funds actually paid or pledged to it by HUD. These projects will be targeted to the municipalities of Clairton, Duquesne, Homestead, Rankin, Braddock, McKees Rocks, and Wilkinsburg. Thereafter, Allegheny County shall expend CDBG funds in these communities in an amount that is at a minimum proportionate to the share of the County CDBG amount attributable by the CDBG formula to these communities in the Urban County Program, subject to modification by the Court for good cause shown.

2. Allegheny County's funding through CDBG funds of acquisition and infrastructure improvements for new scattered site housing, the Fair Housing Services Center, and the operation of the Task Force created by this Decree shall be in addition to the funding obligations set forth in the first paragraph of this section. The funding of the FHSC and the operation of the Task Force through Allegheny County CDBG funds shall not exceed $500,000.00 per year, commencing in April 1995. Until April 1995, the FHSC and the Task Force shall be funded from unencumbered CDBG funds as Task Force projects. Projects selected by the Task Force will conform to appropriate allocations of administrative and delivery expenses, consistent with the manner such allocations are made generally. Through the County's normal application process, the County shall also entertain CDBG applications for projects in municipalities identified in paragraph one. Nothing in this Decree shall limit HUD's obligation and discretion to review and approve Allegheny County's plans for allocating CDBG funds in excess of (1) the 25% set-aside described in paragraph V.D.1., and (2) the funding of the FHSC and Task Force as described in this paragraph, to ensure compliance with all applicable law and regulations.

### E. Transportation

HUD and the Task Force shall request that the Port Authority prepare and submit a survey summarizing the availability of public transportation to each of the ACHA's public housing developments, as well as those sites under consideration for public housing. This survey should indicate the frequency, cost, and routes of each means of public transportation serving each location or potential location. If this survey reveals a pattern of service that appears to encourage the perpetuation of segregation, or to provide inferior service to residents of African–American impacted developments, ACHA and the Task Force shall request public transportation providers to remedy the disparity. Failure of such providers to remedy any such disparity may be considered a basis for a Secretary–Initiated complaint against the providers of such transportation or other enforcement action under the terms of this Decree. Where a site lacks access to public transportation, but otherwise would be chosen as a site for new family public or assisted housing, the ACHA and Task Force shall request the Port Authority to provide public transportation.

### F. Police Protection

HUD, the ACHA and the Task Force will work together to ensure that every public housing development has adequate police protection.

1. Where police protection for a public housing development is not being provided at levels comparable to other neighborhoods, the ACHA shall enforce, under state law or the Cooperation Agreement between it and the unit of local government responsible for such protection, the obligation to provide comparable protection to the ACHA development. Where ACHA has difficulty obtaining the full cooperation of the local municipality in providing equitable police services, HUD will consider whether the failure to provide such police protection may violate the Fair Housing Act. Failure to provide an equal level of police protection at identifiably African–American developments may be considered as a basis for a Secretary–Initiated complaint against the municipality providing

the identifiably African–American developments with inferior service, or other enforcement action under the terms of this Decree.

2. Where HUD considers it necessary, HUD shall approve the use of housing units as space for police sub-stations at family developments where a history of drug or crime problems exists, provided the ACHA negotiates, through a Cooperation Agreement, an arrangement with the local police department to staff the sub-stations during those hours when a police presence on-site would be most likely to discourage criminal activities.

3. The ACHA, with the assistance of HUD and the Task Force, shall develop and implement a plan to ensure adequate police protection at public housing developments located in municipalities that have either no police force, or a skeletal or otherwise inadequate force.

### G. Anti–Crime Programs

In order to further eliminate impediments to desegregation, HUD will help ACHA to identify sources of funding—within HUD and from other sources—for anti-crime activities to be targeted at those public housing developments where drug and crime problems exist and will assist ACHA to actively seek such funding.

### H. Magnet Developments

In addition to the various physical improvements provided for in this Decree, HUD, in consultation with the Plaintiffs and based on the recommendations of the Task Force (see Section IV.C.3.), if HUD determines that such action will be effective in furthering desegregation and it can be accomplished within the limits of ACHA's Comprehensive Grant budget, will propose at certain developments the inclusion of additional amenities and services designed to act as a magnet to attract occupants. These additional amenities will be proposed for developments where high vacancy rates are the result of the reality or perception of a high level of criminal or drug-related activities or there are other factors that make desegrega-

tion difficult. Anti-crime, anti-drug measures, and social service programs will be instituted, and where appropriate, additional physical amenities will be provided. In addition, an outreach and marketing program will be implemented to reduce the vacancy rate at such developments. Notwithstanding this provision, ACHA shall maintain its developments as decent, safe, and sanitary as required by 42 U.S.C. §§ 1437, *et seq.*

### I. Demolition and Replacement of Dilapidated Public Housing Units

1. The ACHA shall conduct a survey of the physical conditions of its family public housing developments and submit a report to the parties respecting the condition of each building at each development. If a development is obsolete as to physical condition, location, or other factors, making it unusable for housing purposes, or a majority of units in any building are sufficiently dilapidated, particularly buildings in high density areas, such that they need substantial rehabilitation and the building is in an identifiably African–American developments in an impacted neighborhood, the ACHA shall submit to HUD, the other parties, and the Court, a demolition or disposition plan for that building or development, in accordance with the applicable provisions of the United States Housing Act of 1937 and its implementing regulations. HUD shall consider any such plan as promptly as possible.

2. In developing replacement plans, ACHA shall propose, to the greatest extent practicable, new construction and acquisition of scattered site public housing, and the use of Section 8 project-based certificates. For replacement units that are not tenant-based, the replacement housing units shall be developed in accordance with Section III.B. and C., above.

3. If any of the replacement units are to be provided through additional Section 8 tenant-based assistance, those Section 8 tenant-based assistance certificates shall be administered pursuant to section VII.A.3.a., below.

### VI. WAITING LIST INITIATIVES

This Decree authorizes the use of race-conscious tenant selection and assignment

practices for all developments and programs administered by the ACHA in an attempt to attain non-racially identifiable developments. ACHA is required to implement an education and outreach effort to income eligible persons throughout the County, to inform such persons about the availability of housing opportunities in all areas of Allegheny County, including Pittsburgh and McKeesport. The Decree also provides for the cross-listing and merger of the ACHA LIPH and Section 8 waiting lists and to the extent housing providers agree to participate, the waiting lists of other assisted housing. HUD reserves the right to review the execution of the waiting list initiatives at any time after the first year of implementation.

## A. Community Wide Waiting List

Effective immediately, the ACHA will utilize a single Community–Wide Waiting List for LIPH and all other assisted units offered through the FHSC.[1] Income eligible applicants who apply to the ACHA will be offered LIPH units throughout Allegheny County.

Within thirty (30) days of the effective date of this Decree, HUD shall require the ACHA to automatically place its public housing applicants on its Section 8 existing housing program waiting list, and vice versa. The ACHA shall not require cross-listed applicants to accept the type of housing that they did not originally apply for, should they reach the top of that waiting list first. The ACHA will review all current applications and cross-list the eligible applicants on the waiting lists of all programs operated by ACHA for which the applicant is eligible, by date and time of original application and by federal preference. After the effective date of this Decree, ACHA applicants will need to complete only one application form for housing assistance for all programs administered by the ACHA, including LIPH, Section 8 tenant-based assistance, and other assisted housing units offered through the FHSC.

Separate waiting lists will be maintained for each program. Participating assisted housing owners, operators, and managers may elect to merge their waiting lists with the conventional public housing list. All offers for assisted units will be treated as offers for conventional public housing units. As vacancies occur, an applicant would be required to consider vacancies for any program for which the applicant is eligible, based upon his or her position on the list. A refusal for other than good cause would result in the applicant being dropped to the bottom of that specific program's list. However, such refusal would not affect the applicant's placement on the list of the other program or programs.

One year after the execution of the Decree, the ACHA will discontinue cross-listing and shall merge the conventional public housing waiting list, from which offers for participating assisted housing units have been made, and the Section 8 waiting list, by date and time of original application and by federal preference, for purposes of making offers of public housing units, Section 8 tenant-based assistance, and other assisted housing units.

## B. Housing Opportunities Waiting Lists

Effective immediately, HUD will require the Housing Authority of the City of Pittsburgh, the Housing Authority of the City of McKeesport, and ACHA to inform eligible applicants for LIPH and Section 8 that they have a right to apply for housing at the other public housing authorities ("PHAs") and to facilitate this application process. Each PHA will also provide applicants with a list of other assisted housing in Allegheny County at the time that the applicant makes application. HUD will provide those lists to the PHAs.

## C. Offers

1. All applicants who reach the top of the waiting list will receive an offer of a housing unit when available.

2. After the entry of this Decree and until the FHSC is operational, the ACHA shall make unit offers using the same procedures as those to be used by the FHSC set

---

1. In accordance with § VII.C.1.b., assisted housing owners, operators, and managers shall have the option to fill vacancies exclusively from the ACHA merged waiting list.

out below, with the exception of the offering of desegregative Section 8 certificates discussed in paragraph 5. In lieu of offering such certificates the ACHA shall offer class members any other available unit.

3. Applicants will first be offered a choice among all existing desegregative opportunities, including vacancies in conventional public housing, Section 8 tenant-based assistance, and, subject to non-discriminatory owner tenant selection criteria, other assisted housing units offered through the FHSC. An offer will not be made if acceptance of the offer would cause the development to no longer qualify as a desegregative opportunity for persons of the applicant's race.

4. Counseling services, including marketing, outreach, support, and a package of incentives designed to encourage applicants to accept desegregative housing opportunities, will be provided to all applicants on the community-wide, cross-listed or merged waiting list, by the FHSC at the time it makes desegregative offers. Such incentives may include, but are not limited to, group moves and transfers, and with respect to LIPH placements, one month's rent, and utility allowances. Counseling services shall also be provided to all section 8 tenant-based assistance recipients.

5. If no desegregative opportunities are available at the time an applicant reaches the top of the community-wide, cross-listed or merged waiting list: class members must be offered one of the 450 desegregative Section 8 certificates if such a certificate is available; and non-class member applicants and those class members for whom a desegregative certificate is not available will be offered, first, the opportunity to remain in place on the list until a desegregative housing opportunity is available, and second, if the applicant does not choose that option, any other available unit. An offer of a unit that, if accepted by an applicant, would cause that development to become racially identifiable should not be offered as "any other available unit" unless no other offers are available.

6. Class members who receive a desegregative certificate must comply with the restrictions on the use of those certificates described in section VII.B. and receive mobility counseling from the FHSC. An offer of tenant-based assistance (other than the 450 desegregative vouchers) will not be considered a desegregative housing opportunity unless the offeree receives mobility counseling from the FHSC (or ACHA prior to FHSC beginning operations).

7. The parties will propose a division of the ACHA jurisdiction, initially into four regions for family LIPH and three regions for elderly developments, that shall provide, to the maximum extent possible, a balance among the regions of racially identifiable developments. The goal is to provide, to the extent practicable, desegregative housing opportunities for all applicants within each region. All applicants on the merged list will be allowed to refuse a desegregative housing opportunity outside of his or her home region and remain at the top of the list waiting for a desegregative offer in their region. Residents of Pittsburgh and residents of other counties have no home region and therefore can not refuse a desegregative housing opportunity on this basis.

8. If the applicant refuses a desegregative offer in the applicant's home region, except where good cause is shown, the applicant would move to the bottom of the merged waiting list and the date of the rejection becomes the applicant's application date. The applicant shall not be offered another unit until either every other applicant eligible for the same size unit with the same or earlier application date has been offered an appropriate unit or has withdrawn his or her request, or six months has elapsed from the rejection of the offer, whichever is longer.

9. Without skipping over applicants, a mechanism must be developed to permit and encourage group moves, a valuable device in attempting to desegregate opposite race developments. Individuals could accept an offer, but delay moving into the unit until others accepted offers that would permit the group move.

D. Transfers

1. **Voluntary Transfers.** ACHA will make available to residents of public housing

the opportunity to transfer between housing developments or programs operated, managed, or administered by ACHA, if such a transfer would result in a desegregated housing opportunity for that resident. To "make available" means to ascertain whether such a transfer would offer a desegregative housing opportunity and to give notice to tenants describing the transfer opportunities and informing the tenants of the actions reasonably necessary to make use of the transfer.

**2. Transfers of Over–Housed and Under–Housed Tenants**

a. Effective immediately the ACHA will develop procedures to:

(i) identify over-housed and under-housed tenants; and

(ii) promptly effect that transfer of such tenants, as required by law, to appropriately sized units that provide a desegregative housing opportunity.

All transfers must be completed by August 15, 1995.

b. Where there is more than one unit that would provide a desegregative housing opportunity the tenant will be offered, and may select from, all such units of appropriate size. A tenant may refuse any desegregative transfer outside of his or her home region as defined in section VI.C.7. However, an over-housed or under-housed tenant who, without good cause, refuses a desegregative transfer within his or her home region will no longer be eligible for ACHA's assisted housing programs.

c. A good cause reason may be used to avert a transfer from a development, but not to avert a transfer to a smaller unit within the development. See sections II.F. and VI.F.

d. For purposes of the initial transfer of over- and under-housed tenants to be completed by August 15, 1995, ACHA will permit families with school age children to delay and transfer until after the completion of the 1994–1995 school year.

e. To the extent that no desegregative housing opportunities exist for over-housed or under-housed tenants, the ACHA shall follow its standard policy governing the transfer of these tenants.

**E. Tenanting of New Housing**

Residents of Talbot Towers at the time demolition was approved shall be given preference to all newly developed public housing and Section 8 project-based certificate housing, consistent with § II.A.7.

**F. Good Cause Review Board**

A three-person Good Cause Review Board shall be established to review and evaluate applicants' and transferees' requests for good cause exceptions. The Board will meet (or confer telephonically) weekly to decide requests submitted to ACHA. The Board will be made up of one designee from a disability and/or tenant advocacy organization recommended by Neighborhood Legal Services Association (NLSA), the Fair Housing Services Center, and the ACHA. The designee must have the authority from its agency to make good cause determinations during the weekly meeting and without further consultation with its agency. In order to make these determinations, the ACHA shall provide each designee to the Board copies of the applications and related materials. The Fair Housing Services Center, in conjunction with the ACHA and the NLSA, will develop guidelines for applicants for good cause exceptions. The ACHA is responsible for insuring that applicants and transferees requesting good cause exceptions fully understand their obligation to provide complete information in support of their applications.

**G. Waiting List Monitoring**

After 18 months, HUD and the ACHA in consultation with the FHSC shall study and submit to the Court a report on whether the waiting list initiatives have achieved substantial progress toward the desegregation standard described in this Decree. If review and evaluation of these initiatives show that the initiatives have failed to achieve desegregation, the parties shall identify and draft modifications to cure the causes of such failure, including modifications to the regions described in section VI.C.7., and additional educational and outreach efforts.

## VII. HOUSING MOBILITY PROGRAM

### A. Fair Housing Services Center

**1. Non–Profit Corporation.** A Fair Housing Services Center (FHSC), a non-profit corporation, shall be established to provide housing mobility services. HUD shall designate a process for selecting the corporation dependant upon the source of federal funds. The process shall allow for significant input from the Plaintiff class and ACHA, to the extent permitted by law.

**2. Funding.** HUD shall provide $200,000 for the activities of the FHSC for the first year of its operation. For the succeeding six years, HUD shall provide $1000 per desegregative housing placement accomplished by the FHSC, up to 200 placements per year, provided that the FHSC compiles a consistently effective record of desegregative placements. The County shall fund through CDBG grants the remaining unfunded activities of the FHSC for seven years. *See* section V.D.2. HUD and the County shall be required to provide the foregoing funds only if the corporation meets the requirements of applicable statutes and HUD regulations, Handbooks, and/or Notices.

**3. Duties of the FHSC.** The responsibilities of the FHSC under the terms of the this Decree shall be:

a. making all offers to applicants, deemed eligible by the ACHA, on the merged waiting list for ACHA public housing, Section 8 tenant- and project-based assistance, and assisted housing, and counseling, encouraging, and assisting all tenants and applicants of the ACHA to make desegregative moves by:

(i) providing counseling and support services respecting housing and economic development opportunities, including home visits, escorting to units, post-move support services, and counseling on educational and employment opportunities;

(ii) extending incentives and inducements for LIPH placements such as rent abatements and the waiver of security deposits; and

(iii) assisting the ACHA in the development and implementation of a plan to provide desegregative group moves for public housing tenants and applicants.

b. administering the 450 new Section 8 desegregative certificates provided by HUD for the exclusive use of those class members who agree to move to rental housing in non-impacted neighborhoods as defined in section II.C., above, and providing counseling and support services to class members utilizing the desegregative certificates. *See* section VII.B. below.

c. conducting outreach to private landlords in non-impacted neighborhoods and counseling and referral services to Section 8 tenants and applicants who wish to utilize their Section 8 tenant-based assistance in a desegregative fashion, in conjunction with sections a. and b.;

d. encouraging and assisting class members to make desegregative moves to privately owned assisted housing units that are not filled from the ACHA's waiting list (*see* section VI., below);

e. monitoring the compliance of the providers of low-income housing in the County (including federally subsidized and assisted housing) with the fair housing laws and the requirements placed upon such providers as a consequence of this Decree; and

f. preparing the notice to the class as provided in section VII.C.1.c.

### B. Section 8 Mobility Program

1. HUD will allocate a maximum of 450 desegregative Section 8 certificates[2] for the exclusive use of those class members who agree to move to private rental housing in non-impacted neighborhoods as defined in section II.C., above. Class members will be allowed 120 days to enter into a lease for the

---

**2.** HUD will provide a maximum of 200 desegregative certificates for the first fiscal year following the adoption of this Decree and an additional 50 a year for the following five years. HUD shall thereafter not treat the determination to renew

the contract to fund the 450 desegregative Section 8 certificates less favorably than determinations it normally makes to renew the funding of certificates generally.

rental of a unit in a non-impacted neighborhood. At the expiration of the 120 days, if the certificate holder has received an offer from the FHSC and has not entered into a lease, the certificate will be returned to the FHSC for distribution to another class member. The desegregative certificates will be offered first to class members in racially identifiable African–American public housing developments, and second, to class members on the ACHA merged waiting list for whom desegregative unit offers are not otherwise available. Non-class members will be eligible for the ACHA's other programs, including its regular Section 8 tenant-based assistance.

2. The ACHA and the FHSC shall monitor market rents throughout the County and specifically in non-impacted neighborhoods every 6 months to determine whether such rents are adversely affecting desegregative housing opportunities. If so, at the request of the FHSC, ACHA shall request that HUD consider whether granting an exception to the Fair Market Rents levels for the Allegheny County market area for certificates and/or payment standards for housing vouchers, pursuant to 24 C.F.R. §§ 882.106(a)(3) and 887.351(b)(2), respectively, would increase the opportunity of class members who sought housing through the Section 8 EHP to obtain a desegregative housing opportunity. If so and otherwise consistent with HUD regulations, HUD shall grant such an exception.

## C. HUD Assisted Housing

The following sections describe the respective functions of the FHSC and HUD with regard to the role of other assisted housing in the Housing Mobility Program:

1. HUD shall perform the following functions:

### a. Modification of Affirmative Fair Housing Marketing Plans

HUD shall direct the owners, operators, or managers of assisted housing developments in Allegheny County to amend the Affirmative Fair Housing Marketing Plan or Equal Housing Opportunity Plan within 90 days of the date of this Decree to include the following procedures:

(i) Each assisted housing development will include the Allegheny County Housing Authority, Pittsburgh Housing Authority, and the McKeesport Housing Authority in the site's respective market area as community sources to be contacted for applicant referrals, and specifically will recruit as applicants those class members referred to it by the FHSC.

(ii) The owner, operator, or manager will record, for each class member in this litigation, the dates each class member applied, the action(s) taken on each such application and date of each action, the dates of each offer of housing assistance made, whether the offer(s) are accepted, the date of any rejected or withdrawn applications, and the specific reasons given by the applicant for any rejection of an offer or withdrawal of an application. On request and at least annually, the owner, operator, or manager will provide a status report that shows its current vacancies, its waiting list, each class member applicant's place on this list, a listing of each unit by bedroom size that was vacated and/or newly occupied since the initial directive from HUD or previous report, all applicants to whom offers were not extended and the reasons therefor, and a designation of offers and acceptances as to each such unit by applicant name, as well as making available the record itemized above.

(iii) Subject to federal preference percentage occupancy requirements, the development will give class member applicants a preference, equal to, but no greater than, the federal selection preferences that are accorded in the recipient-selection process to other applicants who, at the time they are seeking housing assistance, fall in the categories listed in 24 C.F.R. § 960.211(a)(1). All developments subject to this requirement, however, shall cease giving class members the priority and preference required here if and when the African–American occupancy equals or exceeds

the greater of (a) the percentage of the African–American population in need of subsidized housing in Allegheny County, or (b) 58 percent. If the class member preference is no longer required, each class member will continue to receive the same statutory or regulatory federal preference to which the class member would otherwise be entitled.

(iv) The development will determine every three months, the racial composition characteristics of those receiving its assistance and the racial composition of those on the waiting list for its assistance, and HUD will determine annually, the racial identification of the area or neighborhood within which those receiving its assistance are located.

b. In addition to the direction to be provided in a. above, HUD shall advise the owners, operators, and managers of assisted housing developments (hereafter "owners") of, and invite the owners' participation in, the process of filling vacancies in assisted developments from among persons referred by the FHSC from a merged waiting list administered by the ACHA. This notice shall advise the owners that, if the owner chooses to fill all vacancies exclusively by persons referred by the FHSC, participation in this process will relieve the owners of the necessity of maintaining separate waiting lists and of determining the financial eligibility and federal preference status of applicants and will provide a "safe harbor" from HUD monitoring of the owners' compliance with affirmative fair housing marketing obligations. *See* section IX.C.4., below. The notice will also provide materials with which the owners can register to participate in this process.

c. **Notice to Class Members.** HUD shall, based on the information received in VII.C.1.a., provide to the ACHA for distribution to each member of the class annually, a written notice of all HUD-assisted low-income housing developments in Allegheny County that offer class members a desegregative housing opportunity.

FHSC shall provide to ACHA for inclusion in the annual notice:

(i) The full address, telephone number, and name of the person responsible for accepting applications for the development, a short description of the type of housing offered by the development, and the general eligibility requirements for the development.

(ii) The notice shall also include: (a) a provision that informs the class members that, upon a class member's request, the FHSC shall refer, in writing, the name of the class member to specific developments; that the developments will be under a duty to recruit that class member to apply; and specifically what this duty requires; and (b) the telephone number of the HUD Fair Housing and Equal Opportunity ("FHEO") Office that is designated to perform the functions set out in paragraph d., below and a brief description of the functions to be performed by that Office.

d. HUD's Mid–Atlantic Fair Housing Enforcement Center shall respond to complaints of discrimination or of violations of HUD applicant-selection procedures or of the various civil rights statutes applicable to transactions conducted under this Decree. It shall keep written records of the complaints and of all actions taken by HUD as a result of the complaints.

2. The FHSC shall perform the following functions, in addition to making referrals to assisted housing units from the merged waiting list:

a. The FHSC shall maintain a written record of all referrals to assisted housing developments and the results of such referrals, and shall monitor the performance of assisted housing providers in extending offers to persons so referred. To the extent necessary, the FHSC shall request the assistance of HUD in obtaining information from or otherwise monitoring the performance of assisted housing providers.

b. The FHSC shall designate specific personnel to respond to requests for information and requests for assistance from class members desiring to obtain a desegregative housing opportunity. The as-

sistance to be provided shall include referrals of interested class members to public housing developments, and to programs other than low income public housing developments, that offer desegregative housing opportunities in Allegheny County.

### 3. Increased Desegregative Housing Choices

To the extent that HUD determines to fill vacancies in HUD-owned assisted housing developments with LIPH income eligible applicants, HUD will fill such vacancies through the FHSC, unless existing contracts with the entities managing the developments preclude it. HUD's determination on whether to fill vacancies with such applicants will be based on whether keeping uninhabitable units vacant will assist in the disposition of the property and whether higher income families are needed to increase the income mix of the development. Additionally, class members will enjoy the same preference at HUD-owned assisted housing developments as set forth in VII.C.1.a.(iii). When HUD negotiates the sale of any HUD-owned racially identifiable multi-family assisted housing developments, HUD will require that the purchaser have a plan that is intended to produce, to the extent practicable, a non-racially identifiable development. HUD will negotiate sales of HUD-owned developments and single family houses to the ACHA to provide home ownership opportunities for low-income households and the continued affordability for future resales to low-income families.

### 4. General Procedures To Improve ACHA Administration of ACHA's Section 8 Existing Housing Program ("Section 8 EHP") and To Provide Increased Mobility for ACHA's Section 8 EHP Participants

a. To better assure that Housing Quality Standards ("HQSs") are enforced in all units where Section 8 EHP is utilized, ACHA will:

(i) Either contract with the municipalities where such units are located to have initial and annual inspections carried out by the municipal housing code staff, or ACHA will use its own staff or contract with staff of other Section 8 EHP programs to carry out the inspections. Where units are found to be in violation of HQS, municipal, or County codes, steps to obtain compliance will be taken in accordance with Chapter 5 of HUD Handbook 7420.7, and ACHA will request code enforcement from the municipality within which the unit is located. The County will provide to the ACHA such inspection and code enforcement services as it provides throughout the County. HUD, ACHA, and Plaintiffs will discuss promptly alternate measures to encourage compliance.

(ii) Carry out quality control inspections of at least 10 percent of all units utilizing Section 8 EHP assistance annually for six years from the date of this Decree.

(iii) Respond to all Section 8 EHP tenants reporting complaints to ACHA staff about their units, buildings, or complexes by notifying the owner or manager about the complaint and asking that person to address it. Where the owner or manager does not address the complaint appropriately in a reasonable time, ACHA will take the steps outlined for such situations in Chapter 5 of HUD Handbook 7420.7. A "reasonable time" will be determined by the severity of the condition of which the tenant is complaining.

(iv) Provide a special opportunity to each family currently receiving Section 8 EHP assistance as of the date of this Decree to better assure that the dwelling unit which it occupies meets HQS and local code standards. Within 60 days of the date of this Decree, ACHA will notify each Section 8 EHP family by letter that if it believes that the dwelling unit it occupies does not meet HQS and/or local code standards, it may:

(a) seek from its landlord the correction of any dwelling unit conditions it believes violate HQS and/or code standards;

(b) if the landlord fails to correct the reported building deficiencies within a

reasonable period of time, the family may request the ACHA to inspect the property and take appropriate actions to correct any violations that may exist; and

(c) if prior to receiving the ACHA's notice, the family has already requested the landlord to correct such deficiencies, the family may request the ACHA inspection without further communicating with the landlord.

(v) Upon receipt of notice by a participating Section 8 EHP family that it has notified its landlord of such deficiencies, has given the landlord a reasonable time to correct them, and has been unsuccessful in obtaining the needed corrections, ACHA will conduct the requested inspections within a reasonable time after receipt of the family's request, but not to exceed 10 days. The inspection will be conducted by an ACHA employee qualified to conduct inspections pursuant to HUD HQS in accordance with the procedures used for initial HQS inspections. If the unit fails to pass the inspection, ACHA will deal with the matter as outlined in Chapter 5 of HUD Handbook 7420.7. Upon reasonable request, ACHA will make available to Plaintiffs' counsel the requests for inspection, the inspection reports, and all documents reflecting resolution of the complaints.

(vi) To better assure that Section 8 EHP participants are aware that they can move to another dwelling upon completion of one year's tenancy under their lease, ACHA will send notice of this fact to all current participants. In addition, the ACHA will inform Section 8 EHP participants about the availability of the Fair Housing Center's mobility counseling; the availability of ACHA counseling and mobility services (which must be provided consistent with HUD regulations); and the names of three landlords who will accept Section 8 payment and have an appropriately sized unit available for rent in a neighborhood that would represent a desegregative housing opportunity. The ACHA shall include

material generated by the FHSC or otherwise which is intended to describe the positive features of each such neighborhood. The ACHA will also provide the above information to all future Section 8 EHP participants.

(vii) ACHA will conduct a public information and outreach program to landlords with units in Allegheny County, including landlords owning properties in areas where few or no properties currently participate, to make those landlords aware of the rental opportunities available under ACHA's Section 8 EHP.

(viii) In order to comply with this Decree, ACHA will meet the following standards with regard to the Decree's housing mobility provisions. Each year under the Decree, ACHA will use every good faith effort to have a substantial percentage of its section 8 EHP participants use their assistance in neighborhoods which represent a desegregative housing opportunity.

## VIII. HOUSING OPPORTUNITIES ANALYSIS

In an effort to better ensure that class members may have housing opportunities in predominately white neighborhoods which do not have a concentration of assisted housing and that are comparable with the number of housing opportunities in impacted neighborhoods, and/or predominately white neighborhoods with concentrations of assisted housing, HUD will conduct a study of all assisted housing in Allegheny County. After an analysis of the results of this study, HUD will determine if there is a need to provide additional assisted housing in such neighborhoods to provide desegregative housing opportunities.

To the extent that funding may be made available by HUD or others, new or replacement family public and assisted housing, as described in II.A.2., or equivalent housing, if funding is provided by others, shall be sited outside of impacted neighborhoods and the following municipalities: Braddock, Braddock Hills, Clairton, Coraopolis, Duquesne, Homestead, McKees Rocks, North Braddock, Penn Hills, Rankin, and Wilkinsburg. Any

units of new construction public housing shall be scattered site developments, developed in accordance with III.B and C. Additionally, HUD will direct ACHA to use up to 15% of any additional Section 8 certificates that it may receive from HUD for developing project-based housing, unless the Task Force determines that project basing is not feasible.

Nothing in this section shall be construed as a requirement for HUD to fund the development of new family public or assisted housing, or otherwise be construed as a requirement that "resources [be] specifically committed in this decree." See section IX.A.4.

## IX. ENFORCEMENT

HUD shall establish an effective monitoring and enforcement process to include a standardized approach for comprehensive and consistent record keeping and reporting. HUD shall have the responsibility for monitoring the performance of the ACHA under the Decree and its offices will be provided sufficient resources for travel to developments, data analysis, and evaluation.

### A. Injunction and Continuing Jurisdiction

1. Each defendant is hereby enjoined to implement this Decree and to take all action necessary to fulfill its obligations hereunder so as to ensure its implementation.

2. All entities or persons acting in concert or participation with Defendants and who receive notice of this Decree are enjoined from interfering with, obstructing or otherwise frustrating the implementation of this Decree.

3. Seven years after entry of this Decree, the Court shall determine whether its jurisdiction should be continued or terminated. The Court shall extend its jurisdiction over one or more defendants if it determines that (i) the defendants have not fulfilled the specific obligations to be performed within that period set forth in this Decree or, (ii) the ACHA's low income housing programs have not been desegregated to the extent practicable. The Court shall make a determination as to both factors. If the Court extends its jurisdiction solely because of (i) above, its jurisdiction shall end upon fulfillment of those specific obligations. If the court extends its jurisdiction because of (ii) above, such jurisdiction shall end at such time as the Court determines that the ACHA's low income housing programs have been desegregated to the extent practicable.

4. Defendants' commitment of resources over and above resources that would be granted or awarded to the County and the ACHA in the normal course and operation of their programs is limited to those resources specifically committed in this Decree. The commitment of such additional resources shall not extend under any circumstances beyond seven years, except to the extent such extension is necessary to complete the specific obligations, as distinguished from goals or purposes, agreed upon in this Decree.

5. All provisions of this Decree shall require or be construed as requiring compliance with federal statutes, as they now exist or as they may be amended or enacted.

### B. Enforcement

1. Any party may move this Court for an Order to compel or enforce the obligations provided for in this Order after forty-five (45) days notice to the party or parties against which an Order would be sought, stating the default or non-compliance alleged in such a motion, and the actions that must be taken to resolve the alleged default or non-compliance. Only where extraordinary circumstances requires immediate action shall the notice period be waived. In that event, the provisions of Federal Rule of Civil Procedure 65 will govern.

2. Any party may, pursuant to appropriate procedures, move this Court to enter an Order adding another entity or person as a party to this action for the purpose of enjoining that entity or party from interfering with or frustrating the implementation of this Decree.

## C. Implementation and HUD Enforcement

**1. Schedule For Decree Implementation.** Within 60 days, the defendants and the Task Force shall prepare a seven-year implementation schedule and plan, for every element contained herein, and it shall be submitted to the Court and the parties. The schedule shall set out specific duties and deadlines that are appropriate to each type of remedial measure.

**2. Reporting Requirements.** In addition to the specific reporting requirements in this Decree, the defendants, the FHSC and the Task Force shall annually submit a report on the performance of their respective obligations under the Decree to Plaintiffs, and file a copy with the Court.

**3. Enforcement Actions.**

a. If the ACHA, Allegheny County, or RAAC, as the case may be, fail to implement this Decree as approved by the Court, HUD may take any or all of the following actions, in addition to actions in section IX.B. above, in accordance with applicable statutory and regulatory requirements:

(i) Declarations of breach under the ACHA's Annual Contributions Contract;

(ii) Debarment proceedings against the ACHA, Allegheny County, or RAAC director(s), officer(s), and/or other employee(s) responsible for such failure pursuant to 24 CFR 24.305(d)(1) and 24 CFR 24.705(a)(8);

(iii) Withholding or conditioning funding awarded under various HUD programs such as Comprehensive Improvement Assistance Program or the Comprehensive Grant Program;

(iv) Referral of the matter to the Department of Justice for appropriate action; and

(v) Commencement of a Secretary–Initiated Title VIII complaint against the ACHA.

b. In addition, when HUD determines that any entity or person, including the County, or city or locality where an ACHA development is located (or may be located) is impeding the progress of the ACHA in implementing the provisions of this Decree, HUD may institute appropriate actions against that city, State, or other entities including, but not limited to, withholding or conditioning HUD funds under the CDBG and/or other applicable programs, or the commencement of a Secretary–Initiated complaint under the Fair Housing Act.

**4. HUD Monitoring of Federally Subsidized Programs.** HUD will continue to monitor ACHA's compliance with its HUD approved Tenant Selection and Assignment Plan (TSAP) and the VCA to the extent the latter is not superseded by this Decree. HUD, in cooperation with state and local fair housing enforcement organizations, will continue to enforce Title VI of the Civil Rights Act of 1964, Executive Order 11063, Section 109 of the Housing and Community Development Act of 1974, Section 504 of the Rehabilitation Act of 1973, Section 3 of the Housing and Urban Development Act of 1968, and other civil rights statutes administered by HUD. HUD will develop a strategy for appropriate affirmative compliance reviews of select providers of assisted housing in Allegheny County. *See* section VII.C.1.b., above.

**5. Other Enforcement Activity.** HUD will utilize its lawful authority to enforce the Fair Housing Act and thus to seek to remedy any discriminatory treatment in housing and housing related rights that might affect tenants of the ACHA's developments. Upon receiving notice of an indication of possible discriminatory treatment or policies, HUD will make available FHEO personnel who will conduct a preliminary inquiry to determine whether a Secretary–Initiated investigation is warranted. Where the preliminary inquiry indicates that discrimination based upon race, color, religion, sex, familial status, or handicap, has had an adverse affect upon tenants of and applicants to the ACHA's developments, the Assistant Secretary for Fair Housing and Equal Opportunity may initiate a Title VIII complaint and seek redress for the discrimination.

The areas in which HUD will consider the use of the Secretary–Initiated complaint as a tool for the elimination of discrimination in-

clude but are not limited to those listed below:

a. **Provision of Police Protection.** HUD recognizes that police protection is a housing related municipal service which must be provided without regard to race, color, religion, national origin, familial status, or handicap. If HUD receives information indicating that tenants of ACHA housing are receiving police services which are inferior to those provided to persons living in the surrounding community, HUD will investigate to determine whether this disparity in services has a racial or other prohibited basis.

b. **Availability of Sites for the Construction of New Federally Assisted Housing.** In the past, the ACHA has sought to construct new federally-assisted housing and met with opposition from municipal governments and community groups. Upon receipt of information indicating that such opposition to the placement of proposed new federally-assisted housing may interfere with project development and may be based upon racial or other prohibited bases, HUD will conduct a preliminary inquiry. If that inquiry indicates that such action is appropriate, the Assistant Secretary for Fair Housing and Equal Opportunity will initiate a Title VIII complaint against the parties opposing the housing for discriminatory reasons and will seek redress for the aggrieved persons as allowed by law.

c. All of the enforcement powers that are or will be available under the Executive Order No. 12892 (Jan. 17, 1994) will be brought to bear by HUD as appropriate in Allegheny County.

## X. LIMITATIONS BASED ON THE AVAILABILITY OF FEDERAL FUNDING

All resource commitments by HUD and the County included in this Decree are limited subject to the availability of federal appropriations that can legally be used for the stated purposes. If, at any time, HUD or the County is unable to comply with these funding obligations because of lack of appro-priations or a revocation of statutory authority, HUD or the County will so notify Plaintiffs. At that time, the parties may move for such comparable relief as appropriate. Such comparable relief may not result in an increase in HUD's financial obligations as specified in this Decree. The County's obligation is limited to CDBG funds and the provision of direct program administrative services described in section V.D. and expenditures incident to services generally provided throughout the County. In addition, prior to submission of any dispute under this Decree to the Court, counsel for the parties shall consult in an effort to resolve the matter informally.

## XI. ATTORNEYS FEES

Federal defendants agree to pay all reasonable fees and costs incurred by Plaintiffs in this action through the final approval of this Decree, and agree not to seek contribution from any of the other defendants for any such fees or costs. Therefore, Plaintiffs agree not to seek such fees and costs from, and such fees and costs shall not be assessed against, the other defendants.

## XII. ADJUSTMENT IN ACHA OPERATING SUBSIDIES

### A. Current and Past Years

1. Upon ACHA's providing sufficient information to HUD, HUD will, pursuant to 24 C.F.R. § 990.118, upwardly adjust ACHA's operating subsidies for the years ending September 30, 1993 and September 30, 1994, to the extent that ACHA has not already received any such relief in the applicable year(s), to compensate ACHA for any units vacant as a result of the single waiting list for public housing used by ACHA since 1991 or the 1992 Voluntary Compliance Agreement.

2. Upon ACHA's providing sufficient information to HUD, HUD will consider granting a waiver under 24 C.F.R. Part 990 to upwardly adjust ACHA's operating subsidies for the years ending September 30, 1993 and September 30, 1994, to the extent that ACHA has not already received any such relief in the applicable year(s), to compensate

ACHA for any units vacant as a result of funded on-schedule modernization.

3. Upon ACHA's providing sufficient information to HUD, HUD will consider granting a waiver under 24 C.F.R. Part 990 to upwardly adjust ACHA's operating subsidies for the years ending September 30, 1991 and September 30, 1992, to the extent that ACHA has not already received any such relief in the applicable year(s), to compensate ACHA for any units that were vacant as a result of the single waiting list for public housing used by ACHA since 1991 or the 1992 Voluntary Compliance Agreement.

**B. Future Years**

For the year ending 1995, ACHA will be eligible pursuant to 24 C.F.R. § 990.118(i) for an upward adjustment of its operating subsidy for any units vacant as a result of court-ordered, or HUD-approved, constraints relating to Title VI of the Civil Rights Act of 1964, or for any units vacant as a result of funded on-schedule modernization.

CONSENTED TO:

**PLAINTIFFS, CHERYL SANDERS, ET AL., BY AND ON BEHALF OF THE CLASS**

BY: [Signature]

**THE UNITED STATES DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT, AND ITS SECRETARY**

BY: Richard S. Lepley

**THE ALLEGHENY COUNTY HOUSING AUTHORITY**

BY: [Signature]

**THE COUNTY OF ALLEGHENY**

BY: [Signature]

**THE REDEVELOPMENT AUTHORITY OF ALLEGHENY COUNTY**

BY: Stanley N. Horn

**AND NOW,** this 12th day of December, 1994, it is ORDERED, ADJUDGED, and DECREED that the foregoing is entered as an Order of this Court.